IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAY P. MALMQUIST, D.M.D; JAY P.
MALMQUIST, D.M.D., P.C.; RODNEY S.
NICHOLS, D.M.D., P.C.; HENRY C. WINDELL,
D.M.D.; HENRY C. WINDELL, D.M.D.,
P.C., NORTHWEST ORAL AND
MAXILLOFACIAL SURGEONS, LLC;
and GARY T. PEDERSON, D.D.S., P.C.

   Plaintiffs,

               CV. 09-1309-PK

               FINDINGS AND
v.              RECOMMENDATION

OMS NATIONAL INSURANCE
COMPANY, an Illinois Risk Retention
Group; BRENDA L. MACLAREN-
BEATTIE dba THE MACLARENT GROUP,

   Defendants.

PAPAK, Judge:

   Plaintiffs are oral surgeons and their corporations who purchased several different

Page 1 - FINDINGS AND RECOMMENDATION

insurance products from an insurance agent, Brenda MacLaren-Beattie ("MacLaren"), who was

associated with OMS National Insurance Company ("National Insurance" or "National").

MacLaren sold plaintiffs professional liability insurance policies written by National Insurance as

well as business, general liability, and umbrella coverage from Mutual of Enumclaw, another

insurer.  Plaintiffs' claims arise out of MacLaren's alleged failure to actually procure the Mutual

of Enumclaw coverage that plaintiffs purchased.  This court has jurisdiction pursuant to 28

U.S.C. § 1332.  Judgment has already been entered against defendant MacLaren.  Now before the

court is National Insurance's motion for summary judgment (#27), plaintiffs' cross-motion for

partial summary judgment[1] (#48) and plaintiffs' motion to strike (#49).  For the reasons

discussed below, National Insurance's motion for summary judgment should be granted in part

and denied in part, plaintiffs' cross-motion for partial summary judgment should be denied, and

plaintiffs' motion to strike is denied.

## BACKGROUND

Plaintiffs Jay Malmquist, Rodney Nichols, Henry Windell, and Gary Pederson are oral

and maxillofacial surgeons (OMS) residing in Oregon.   Defendant National Insurance is an

Illinois insurance company whose sole business is providing professional liability insurance to

oral and maxillofacial surgeons.  MacLaren formerly sold insurance from an office in

Washington.  At various times in the 1990s and early 2000s, the plaintiffs purchased National

Insurance professional liability coverage from MacLaren.   No impropriety is alleged in

MacLaren's handling of these policies.

_____

[1]Plaintiffs apparently style their motion as one for partial summary judgment because, although they seek summary judgment on all their claims, they only address the issue of liability for each.

Page 2 - FINDINGS AND RECOMMENDATION

The plaintiffs, however, also used MacLaren to obtain other types of insurance coverage that they believed were affiliated with National Insurance. MacLaren accepted plaintiffs' premiums for those other insurance products and issued Certificates of Liability Insurance[2] listing Mutual of Enumclaw as the insurer, but never actually obtained insurance coverage for plaintiffs. Plaintiffs allege that as a result they suffered damages from the loss of insurance premiums. Malmquist claims additional damages resulting from his defense and settlement of a claim occurring during the period when MacLaren failed to acquire coverage that Malmquist purchased.

In March 2007, National Insurance decided not to renew its agency agreement with MacLaren because it determined that MacLaren was not developing enough new business for National and because it found that MacLaren had improperly handled customers' premium checks.[3] National Insurance notified all of its customers in Oregon and Washington, including plaintiffs, that it had terminated its relationship with MacLaren, but gave no explanation for its decision. When one plaintiff, Gary Pederson, inquired with National about the reason for National's disassociation with MacLaren, National allegedly told him that MacLaren had not been involved in any improper or suspicious behavior. Consequently, Pederson continued to use MacLaren to purchase insurance products other than professional liability coverage. Ultimately, in 2009, the Office of the Insurance Commissioner of the State of Washington investigated

---

[2] The insurance certificates for these other insurance products appeared identical to certificates for National Insurance's professional liability products, except that they listed Mutual of Enumclaw as insurer.

[3] National asserts that, when it allowed MacLaren's agency agreement to lapse, it did not know that MacLaren had issued fraudulent certificates of insurance to plaintiffs or any other National Insurance customers. (Sterling Decl., #31,¶12.)

MacLaren's conduct and MacLaren confessed to defrauding over 40 oral surgeons in Oregon and Washington by issuing false insurance certificates. Plaintiffs brought suit against MacLaren and National Insurance in state court in September 2009. National Insurance removed the action to this court. After amending their complaint, plaintiffs ultimately alleged claims for negligence, breach of contract, fraud, violation of the Oregon Unfair Trade Practices Act, and violations Washington's Consumer Protection Act against MacLaren and National, as well a claim for negligent supervision against National.

## I.    National Insurance

National Insurance is closely associated with the oral surgery profession. The corporation was formed by a committee of the American Associate of Oral and Maxillofacial Surgeons (AAOMS), the dominant professional organization in the field, as an insurance company exclusively for oral surgeons. (Malmquist Decl., ¶5). National aligned itself with AAOMS, and AAOMS formally designated National Insurance as its recommended professional liability insurer. *Id.* National required its customers to buy stock in National and be AAOMS members in order to be eligible for National's professional liability insurance. (*See, e.g.*, Malmquist Decl., ¶8.) The parties dispute whether National required customers to have general liability insurance in order to obtain National's professional liability coverage.[4]

---

[4] Plaintiffs contend that National Insurance actually required customers to have other insurance in place, including general liability coverage, before National would insure them. (Pederson Decl., ¶8). Specifically, plaintiffs point to a clause in one of their professional liability insurance applications stating that "as a prerequisite to acceptance of this application . . . I agree to abide by any recommendations of [National's] Risk Management Committee," (Passolt Decl., #72, Ex. 2 at 10), in conjunction with the fact that while attending National's Risk Management Seminars, National consistently recommended that plaintiffs carry general liability insurance. (Supp. Nichols Decl., #79, ¶¶2-3.) By contrast, National asserts that it has never required other insurance as a prerequisite for National's professional liability coverage. (Passolt Decl., ¶7.)

## II.   MacLaren's Agency Agreement with National Insurance

In 1997, National Insurance engaged defendant Brenda MacLaren-Beattie as an agent to market and service their professional liability insurance in Oregon and Washington.  (Sterling Decl., #31, ¶7.)  MacLaren and National Insurance (formerly called AAOMS National Insurance Company) signed an "Agency Agreement" defining their relationship.  (Wagner Decl., #55, Ex. A at 1-17.)  That agreement stated that MacLaren was an "authorized agent" of National Insurance engaged to render "certain services only."  *Id.* at ¶1.3.  The agreement required MacLaren to aggressively market and service National's professional liability insurance products to eligible oral and maxillofacial surgeons in her territory, obtain policy renewals, handle changes in policies, assure timely premium payments, respond to customers' questions, and notify National of customers' claims.  *Id.* at ¶3.11.  MacLaren, however, could not accept customers' premiums in her own name.  *Id.* at ¶¶3.6, 4.3.  The agreement also prohibited MacLaren from selling another carrier's professional liability insurance to oral and maxillofacial surgeons unless she received National's consent, but allowed MacLaren to make independent evaluations and sales of other types of insurance coverage on behalf of other insurers.  *Id.* at ¶1.3.  In fact, the agreement specifically contemplated MacLaren referring National's current or potential customers to other insurers to obtain other types of insurance not offered by National, such as professional office coverage.  *Id.* at ¶3.11.  Finally, while the agreement preserved National's right to appoint other agents in MacLaren's territory, Oregon and Washington, *id.* at ¶2.1,

According to National, none of its publications or applications included that requirement.  *Id.* at ¶10.  And, although the Washington Office of Insurance Commissioner's Report of Investigation regarding MacLaren recites that National requires customers to have general liability coverage, National states that the report is incorrect.  *Id.* at 11.

Page 5 - FINDINGS AND RECOMMENDATION

plaintiffs assert that National held MacLaren out to be its exclusive agent in those states.  (*See,*

*e.g.,* Malmquist Decl., #52, ¶6a; Pederson Decl., #51, ¶7.)

## III.    National Insurance's Advertising and Promotional Activities

The parties present contrasting evidence concerning the scope of National's marketing

activities, particularly the degree to which National advertised that its agents could provide

customers with insurance products, other than professional liability, coverage at discounted rates.

### A.    General Statements

Plaintiffs consistently assert that National advertised that its agents could secure all types

of insurance for oral surgery practices at reduced rates.  First, various plaintiffs describe receiving

marketing literature in the mail and hearing from National representatives that National's agents

could obtain general, business liability, and umbrella insurance with other carriers at favorable

rates because of National's alliances and corporate buying power.  (Malmquist Decl, ¶6b;

Nichols Decl, ¶6; Pederson Decl., ¶6.)  Plaintiffs also assert that National handed out such

materials, including lists of insurance services offered by MacLaren, at professional seminars and

meetings. (Pederson Decl., ¶8; Nichols Decl., ¶10.)  Moreover, plaintiffs describe that National

promoted MacLaren as "being able to handle all the insurance needs of all oral surgeons in

Oregon."  (Malmquist Decl., ¶6c; *see also* Nichols Decl., ¶7) (National recommended that

Oregon customers "consult with MacLaren regarding whatever insurance questions or issue they

might have, be they professional liability-related, general liability-related, umbrella-related or

otherwise.")  Although plaintiffs generally discarded those advertisements and failed to keep

records about National representatives' statements, plaintiffs present two documents containing

similar marketing messages.

Page 6 - FINDINGS AND RECOMMENDATION

**B.      December 1998 Newsletter**

Plaintiffs rely upon a December 1998 newsletter published by National Insurance (under its former name, AAOMS National Insurance Company) with a short article describing National's ability to offer insurance products beyond professional liability coverage.  (Wagner Decl., Ex. 6 at 2.)  The newsletter describes a new alliance with Kemper, another insurance company, to provide "business office, workers' compensation and umbrella policies" to National's insureds "through your current agent."  *Id.*  The brochure touts the program as "'just another step in [National Insurance's] efforts to provide complete insurance coverage for the practicing OMS.'"  *Id.*  The article ends with the exhortation "So get it all from [National Insurance]!" and encourages readers to contact their local National agent or National itself for more information about the Kemper program.

**C.      2002 Brochure**

In 2002, Dr. Pederson received a brochure from National when he was considering switching to National's professional liability insurance.  (Pederson Decl., ¶5.)  That brochure includes a section titled "Outstanding Features" stating:

> We deliver more than insurance to our policyholders. We actively search out ways to use our buying power status to benefit the OMS community.  Some of the additional features we offer include:
>
>> -The OMS National Funds- a family of investment funds for the retirement needs of the OMS and their practices.
>> -Business Office, Workers' Compensation, and Umbrella Insurance – through an alliance with Kemper Insurance, *the Company's agents can provide these additional coverages for your practice.*
>> -Web Site Development– through an alliance with PBHS, policyholders receive a discount on web site development for their practices.

*Id.* at Ex. 1, 4 (emphasis added). Plaintiffs allege that the final page of the brochure Pederson received from National consisted of a flier bearing the name and logo of the MacLaren Group and advertising "specialties" like personal disability income, life insurance, and financial advisory services, as well as "Professional Liability Insurance" by "OMS National Insurance Co." and "Business Owners Package Policy" by "Berkshire Hathaway Homestates." *Id.* at Ex. 1, 10.[5]

Pederson stated that the information in those marketing documents about National's affiliations with other insurance carriers convinced him to switch his professional liability insurance to National in 2002 and use MacLaren to purchase other insurance coverage for his practice. (Pederson Decl. at Ex. 5.) Other plaintiffs recount similar reasons for purchasing professional liability insurance from National and other insurance products from MacLaren. (Malmquist Decl., ¶9; Nichols Decl., ¶7.) One plaintiff even viewed National's offers for additional services like general liability insurance to be part of its efforts to compete with larger, more diversified insurance carriers by providing a wide range of benefits to its niche market of oral surgeons. (Pederson Decl., ¶6.) Moreover, after becoming a National customer, one plaintiff discovered that the rates quoted by MacLaren for non-professional liability insurance were substantially lower than the rates he had been paying previously, which supported his perception that he were getting favorable rates because of National's alliances with the other insurance carriers. (Malmquist Decl., ¶9.)

### D. Kemper Insurance Program

---

[5] National asserts that it does not include marketing materials for agents, such as the flier presented by Pederson, with promotional brochures that it sends to prospective or current customers. (Passolt Decl., #72, ¶23.)

Although National admits that it advertised a program where customers could purchase general business insurance from National agents, National asserts that the program never secured favorable rates for National customers and was not utilized by plaintiffs in this case. The program referenced in the 1998 newsletter and the 2002 brochure was an endorsement arrangement between National and Kemper Insurance that operated between 1998 and 2003 by which National agents could offer Kemper business office, worker's compensation, and umbrella coverages to any customers, including National insureds. (Passolt Decl. for Mot. to Strike, #69, ¶4). Under that arrangement, commissions would be paid by Kemper directly to National agents, with National receiving a small percentage of premiums as compensation for marketing the program. *Id.* at Ex. 1. Apparently, National discontinued the program because of a lack of interest from its customers. *Id.* at ¶4. National asserts that few, if any, Kemper insurance products were ever sold under the arrangement, and that National never received the marketing fee envisioned. *Id.* There is no indication that the program with Kemper offered discounted insurance rates to National customers. Moreover, National asserts that none of the plaintiffs in this case purchased insurance coverage through the Kemper program. *Id.* at ¶6. Thus, while National admits advertising that its agents could obtain Kemper insurance at conventional rates, National claims that it made no such promises regarding insurance from other carriers. (*See* Sterling Decl., #31, ¶20.)

## IV. Association Between MacLaren and National

Plaintiffs suggest that there was no perceptible distinction between MacLaren and National Insurance. For example, there is no dispute that MacLaren and National Insurance officials jointly staffed booths with National Insurance's name and logo at oral surgery

professional meetings where both MacLaren and the National Insurance representative answered questions, passed out literature, and promoted National Insurance's products.  (Pederson Decl., ¶9; Nichols Decl., ¶11; Malmquist Decl., ¶11.)  Further, plaintiffs assert that National Insurance advertised MacLaren to oral surgeons in Oregon and Washington as its exclusive agent for all purposes, never affirmatively limiting her role to sale of a specific type of insurance.[6] (Malmquist Decl., ¶¶6a,12; Pederson Decl., ¶¶7,10; Nichols Decl., ¶12; Windell Decl., ¶4.) Additionally, plaintiffs state that National Insurance vouched for MacLaren's trustworthiness as its agent, and consequently, that they believed National stood behind her completely. (Malmquist Decl., ¶10;Nichols Decl., ¶8; Pederson, ¶10.)  Moreover, National allegedly even asked one plaintiff, who held elected positions in the AAOMS, to use his credibility within the Oregon oral surgery community to promote MacLaren and her services. (Malmquist Decl., ¶12.)

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues exist for trial.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996).  When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but merely to determine whether there is a

_____

[6] National Insurance admits that it advertised MacLaren as an agent for marketing and sales of its professional liability insurance, but denies that it ever presented MacLaren as National's agent for any other purpose.

genuine issue for trial. *Liberty Lobby*, 477 U.S. at 249;  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322-23; *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor*, 880 F.2d at 1045; *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Liberty Lobby*, 477 U.S. at 249-50; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Taylor*, 880 F.2d at 1045.

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other.  *See* Fed. R. Civ. P. 56; *see also*, *e.g.*, *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

**DISCUSSION**

Page 11 - FINDINGS AND RECOMMENDATION

I.      **Motion to Strike and Evidentiary Objections**

    A.      **Plaintiffs' Motion to Strike**

Plaintiffs move to strike the affidavit of National Insurance's general counsel, Victoria Sterling, because it "contains demonstrably and incontrovertibly false statements" about National Insurance's corporate documents and practices which plaintiffs assert were not disclosed during discovery.  Plaintiffs also argue that Sterling's conduct in asserting such false testimony justifies granting plaintiffs' cross-motion for summary judgment.  Plaintiffs, however, provide no legal authority supporting any of their arguments.

First, Sterling's affidavit is not properly subject to a motion to strike under Federal Rule of Civil Procedure 12(f).  *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983) (only pleadings are subject to a motion to strike under Rule 12(f)).  However, evidence of a moving party that would be inadmissible is subject to a timely objection on summary judgment and may be stricken.  *See FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991). Plaintiffs, however, do not identify any reasons why portions of Sterling's affidavit would be inadmissible under the Federal Rules of Evidence.  Merely arguing that her statements are false does not suffice.  Finally, National Insurance admits that Sterling's affidavit was partially incorrect where it denied the existence of the arrangement with Kemper and National provides an additional declaration describing that program and correcting Sterling's erroneous account. (Passolt Decl. for Mot. to Strike, #69.)  I will disregard Sterling's affidavit to the extent that it  is admittedly partially incorrect, but otherwise give it appropriate weight in light of all the other evidence in the record.  Thus, plaintiffs' motion to strike is denied.

    B.      **National Insurance's Evidentiary Objections**

Page 12 - FINDINGS AND RECOMMENDATION

National Insurance raises evidentiary objections to substantial portions of plaintiffs' declarations, arguing that they contain inadmissible hearsay in the form of statements attributed to unidentified employees of National Insurance. For the majority of plaintiffs' claims for relief, however, those portions of plaintiffs' declarations are non-hearsay offered their effect on the plaintiffs, not for their truth. As I describe in more detail below, one way for a principal to create apparent authority in an agent is through actions which, "when reasonably interpreted, cause a third party to believe that the principal consents to have the apparent agent act for him in that matter." *Taylor v. Ramsay-Gerding Const. Co.,* 196 P.3d 532, 536 (Or. 2008) (en banc) (quoting *Wiggins v. Barrett & Associates, Inc.*, 669 P.2d 1132 (Or. 1983)). Here, for plaintiffs' vicarious liability claims, the statements of National Insurance personnel concerning MacLaren's role and abilities are offered for their effect on the plaintiffs in leading them to believe that National Insurance consented to have MacLaren act as their agent in all insurance-related activities.

An example is instructive. National Insurance objects to the following statement, among many others, as inadmissible hearsay: "We were told by [National] that if we had insurance-related questions or issues of any nature we should call Brenda MacLaren." (Pederson Decl., ¶10). For purposes of determining whether MacLaren had apparent authority, it is irrelevant whether MacLaren in fact could assist plaintiffs with any insurance-related question. Rather, the statement is offered to prove the fact that, because National representatives told plaintiffs to contact MacLaren for all insurance needs, it was reasonable for plaintiffs to believe that National consented for MacLaren to act on its behalf in obtaining non-professional liability insurance for plaintiffs.

National Insurance also argues that because some courts exclude statements by

Page 13 - FINDINGS AND RECOMMENDATION

unidentified declarants, plaintiffs' declarations containing similar statements should also be

excluded.  Cases which exclude such evidence, however, rely on reasoning that is inapplicable

when statements are offered for a purpose other than their truth.  For example, in *Carden v.*

*Westinghouse Elec. Corp*, the Court addressed whether certain testimony repeating a statement

by an unidentified person was admissible under Fed. R. Evid. 801(d)(2)(D), the admission by a

party-opponent exemption to the hearsay rule.  *Carden*, 850 F.2d 996, 1003 (3d Cir. 1988).

There, the Court held that the testimony was inadmissible, relying on analysis from another

federal appellate court specifically discussing the admission by a party opponent hearsay

exemption as well as general notions about the unreliability of statements by unidentified

declarants in other contexts.[7]  *Id.*  Thus, *Carden* suggests that statements by unidentified

declarants may not satisfy the requirements for the admission by a party opponent exemption to

the hearsay rule if they lack sufficient reliability.  That exemption, however, is not at issue for the

majority of plaintiffs' claims relying on vicarious liability.

Further, I am not persuaded that the disputed portions of plaintiffs' declarations would be

inadmissible even if they were offered for their truth.  As I describe in more detail below, two of

plaintiffs' claims seek to establish that National was directly liable for certain conduct.  Thus, for

these claims only, plaintiffs must present the statements of unidentified National Insurance

---

[7] The *Carden* court relied on and reproduced the reasoning of *Cedeck v. Hamiltonian Federal Savings and Loan Association*, 551 F.2d 1136, 1137 (8th Cir.1977),  a case where the Court held that an uncorroborated statement of an unidentified declarant was not an admission by a party opponent because the author of the statement was unknown, and was thus inadmissible hearsay.  *Carden*, 850 F.2d at 1003.  The *Carden* court also noted that in related contexts, such as under the excited utterance exception to the hearsay rule, declarations of unidentified speakers are rarely admitted because of the proponent's heavy burden of satisfying evidentiary and trustworthiness requirements.  *Id.*

officials for their truth, not just for their effect on plaintiffs.  Despite the statements' foundational

weakness, they can still possess sufficient indicia of reliability to satisfy the personal knowledge

requirement of Federal Rule of Evidence 602.  *See SEC v. Singer*, 786 F.Supp. 1158, 1167

(S.D.N.Y 1992) ("a witness' conclusion based on personal observations over time may constitute

personal knowledge despite the witness' inability to recall the specific incidents upon which he

based his conclusions.") (emphasis removed).  Moreover, several factors suggest that the

statements of unidentified National officials are reliable enough to be considered admissions by a

party opponent.  First, written materials offered by plaintiffs corroborate the alleged verbal

statements that plaintiffs could use National agents to obtain other insurance products.  Also,

plaintiffs were in contact with high-level National representatives; Nichols was a member of

National Insurance's Advisory Committee while Malmquist was an elected official of AAOMS,

National's partner organization.  Thus, it is likely that the individuals who encouraged plaintiffs

to rely on MacLaren for a wide range of insurance products had the authority to speak on behalf

of National Insurance when making those statements.  In sum, National Insurance's evidentiary

objections are denied.[8]

### C.    Plaintiffs' Evidentiary Objections

Plaintiffs also object to a number of statements in declarations by National's general

counsel and National's president, arguing that the statements are either clearly contradicted by

other evidence or that the declarants lacks personal knowledge.  Concerning the first type of

---

[8] This finding, however, is not crucial to my later analysis of the merits of National
Insurance's motion for summary judgment.  Even if I disregard all the statements of unidentified
National representatives, plaintiffs still produce enough evidence, albeit barely enough evidence,
to withstand summary judgment.

objection, I simply note that contradicted evidence is not necessarily inadmissible.  Regarding the

second class of objections under Federal Rule of Evidence 602, personal knowledge can be

inferred from a declarant's position and the nature of her participation in a matter, *Barthelemy v.*

*Air Line Pilots Ass'n*, 897 F.2d 999, 1018 (1990), especially with a manager testifying about a

business' normal procedures.  *See United States v. Thompson*, 559 F.2d 552, 553-554 (9th Cir.

1977).  Thus, statements by National's upper-level management concerning National's business

policies and practices will likely satisfy the personal knowledge requirement.  However, I need

not individually resolve each of plaintiffs' evidentiary objections now because even if I

disregarded each objectionable statement I would still reach the same result in denying National's

summary judgment motion.

## II.    National Insurance's Motion for Summary Judgment

The central issue in this motion is whether MacLaren acted as National's agent in selling

all types of insurance products to plaintiffs.  National Insurance argues that there is no factual

dispute that it held out MacLaren as its agent *only* for the purpose of selling its own professional

liability insurance and, therefore, that it cannot be held vicariously liable for MacLaren's

fraudulent insurance sales.  Plaintiffs, however, present sufficient evidence to create a genuine

issue of material fact concerning whether National Insurance bestowed apparent authority on

MacLaren to act as its agent for all insurance sales.  Furthermore, plaintiffs put forth enough

evidence to create genuine disputes on their claims not involving vicarious liability .

Accordingly, National's motion should be denied.

### A.    Statutory Agency

Oregon law recognizes a statutory basis for agency in the insurance context.  Or. Rev.

Page 16 - FINDINGS AND RECOMMENDATION

Stat. § 744.078(4) provides in part: "any person who solicits or procures an application for

insurance as an agent of the insurer shall in all matters relating to the application for insurance

and the policy issued in consequence of the application be regarded as the agent of the insurer

issuing the policy and not the agent of the insured."  Or. Rev. Stat. § 744.078(4).  National

Insurance argues that since MacLaren issued fraudulent insurance policies to plaintiffs naming

Mutual of Enumclaw as the insurer, MacLaren would be regarded as an agent of Mutual of

Enumclaw under Or. Rev. Stat. § 744.078(4).  Plaintiffs do not dispute this point.  Therefore, the

only potential basis for MacLaren's agency is common law.

### B.    Vicarious Liability

In general, a principal is liable for the actions of a non-employee agent "only if those

actions are within the actual or apparent authorization of the principal." *Jensen v. Medley*, 82

P.3d 149, 154 (Or. 2003).  The most recent Oregon Supreme Court case dealing with a

principal's vicarious liability for wrongful acts of its agent is *Taylor v. Ramsay-Gerding Const.

Co.*, 196 P.3d 532 (Or. 2008) (en banc).  There, the Court explained the basic principles of

Oregon agency law:

> Actual authority may be express or implied.  When a principal explicitly authorizes the
> agent to perform certain acts, the agent has express authority.  However, most actual
> authority is implied: a principal implicitly permits the agent to do those things that are
> "reasonably necessary" for carrying out the agent's express authority.  In contrast, a
> principal also may be bound by actions taken that are "completely outside" of the agent's
> actual authority, if the principal allows the agent to appear to have the authority to bind
> the principal.  Such a circumstance is called "apparent authority."
>
> For a principal to be bound by an agent's action, the principal must take some affirmative
> step, either to grant the agent authority or to create the appearance of authority.  An
> agent's actions, standing alone and without some action by the principal, cannot create
> authority to bind the principal.  Thus, "'[a]pparent authority to do any particular act can
> be created only by some conduct of the principal which, when reasonably interpreted,

causes a third party to believe that the principal consents to have the apparent agent act for him on that matter.'"  Additionally, the third party must "'rely on that belief'" when dealing with the agent.

*Taylor v. Ramsay-Gerding Constr. Co.*, 196 P.3d 532, 536 (Or. 2008) (internal citations omitted).  Thus, for National Insurance to prevail on summary judgment, it must demonstrate that, as a matter of law, it neither granted MacLaren actual authority to sell other insurance products on its behalf nor created the appearance that MacLaren had authority to act on its behalf in selling those products.

### C.    Actual Authority

Whether an agents' acts are actually authorized by an insurer is a question of fact.  *J-P Int'l, Ltd. v. Thompson*, 838 P.2d 616, 618 (Or. Ct. App. 1992).  When an agent's actual authority is limited and the insured has notice of that limitation, the insurer is not bound by the agent's acts beyond the agent's actual authority.  *Weidert v. State Ins. Co.*, 24 P. 242, 245 (Or. 1890).  For example, if the insurance application plainly and unambiguously sets forth limitations on the agent's actual authority, the insured is deemed to have notice of those limitations.  *Lundquist v. Fox*, 624 P.2d 667, 670 (Or. Ct. App. 1981).

Since I conclude below that plaintiffs create a triable issue on the question of MacLaren's apparent authority, I need not determine conclusively whether MacLaren also acted under actual authority.  Nevertheless, I note several ambiguities in MacLaren's agency agreement with National Insurance that are pertinent to MacLaren's potential actual authority.  First, although the agreement focuses on MacLaren's duties to sell professional liability insurance, it also

contemplates her sale of other types of insurance to National's customers.[9]  Second, the

agreement employs ambiguous language in describing MacLaren's responsibilities regarding

referrals to other insurance carriers for non-competing insurance products.[10]  Though plaintiffs'

arguments for MacLaren's actual authority are not nearly as persuasive as for apparent authority,

plaintiffs are free to focus their actual authority claim at trial.

---

[9]  The section titled "Agent's Primary Duty and Loyalty" provides:

[National Insurance] is engaging Agent hereunder to render certain services only
as an authorized agent of [National Insurance] who has a primary duty and loyalty
to [National Insurance]. [National Insurance] recognizes that Agent, in other
circumstances and when acting on behalf of other insurers, may have the ability to
make independent evaluations and placements of insurance coverage.
Nevertheless, Company and Agent agree that with respect to the placement of
professional liability insurance to OMS who are members of AAOMS, Agent's
primary duty and loyalty to the Company, as set forth herein, requires that Agent
place such professional liability insurance only with the Company, unless the
Company grants its prior written consent to Agent to do otherwise. Such consent
must be obtained separately as to each member of AAOMS for whom
professional liability insurance is to be placed by Agent with another carrier,
although such consent will not be unreasonably withheld. As a result, the parties
hereto acknowledge that Agent is not independent for purposes of this Agreement
and for purposes of placing professional-liability insurance for OMS who are
members of AAOMS.

(Wagner Decl., ¶1.3).

[10]  In a section titled "Services," the agreement provides:

Agent shall refer insureds and prospective insureds of the [National Insurance]
only to such other insurers as may enable insureds or prospective insureds of
[National Insurance] to obtain types of coverage not offered by [National
Insurance], such as professional office coverage.  Where [National Insurance]
offers the coverage that the insured or prospective insured seeks, no such referral
shall be made.

(Wagner Decl., ¶3.11).   The use of the word "shall" could either constitute an affirmative
requirement to make referrals or merely a limitation on the types of referrals that the agent could
make.

Page 19 - FINDINGS AND RECOMMENDATION

**D.      Apparent Authority**

Apparent authority requires that the principal engage in some conduct that the principal should realize is likely to cause a third person to believe that the agent has authority to act on the principal's behalf.  *Taylor*, 196 P.3d at 536 (citing *Badger v. Paulson Investment Co., Inc.*, 311 Or. 14, 803 P.2d 1178 (1991)).  Most recently, the Oregon Supreme Court has organized the apparent authority analysis into three separate inquiries: (1) whether the principal took sufficient steps to create the apparent authority for the agent to do the particular action on behalf of the principal; (2) whether the principal's conduct reasonably led plaintiffs to believe that the agent was authorized by the principal to act in that manner; and (3) whether the plaintiffs reasonably relied on the agent's apparent authority.  *Id.* at 537-38.  Although the focus of the court's inquiry should be on the principal's conduct, "the third party need not receive information respecting either the nature or the extent of that conduct directly from the principal."  *Id.* at 536.  The information upon which the third party relies may come directly from the principal, from authorized statements of the agent, from documents or other indicia of authority given by the principal to the agent, or from third parties who have heard of the agent's authority through authorized or permitted channels of communication.  *Id.*

Here, I find that plaintiffs present sufficient evidence to create factual disputes concerning each of the three analytical steps described above.  First, plaintiffs produce considerable evidence, much of it contested, that National Insurance's conduct created apparent authority in MacLaren to sell non-competing insurance products to National's customers.  Initially, by expressly authorizing MacLaren to sell its professional liability insurance products, National Insurance arguably suggested that MacLaren had the authority to sell other insurance lines.  *See*

Page 20 - FINDINGS AND RECOMMENDATION

*Taylor*, 196 P.3d at 536 ("when a principal clothes an agent with actual authority to perform certain tasks, the principal might create apparent authority to perform other, related tasks.") Moreover, National's alleged promotional practices, including telling oral surgeons that they could contact MacLaren for all their professional insurance needs and stating that MacLaren was their exclusive agent in Oregon and Washington, could have reinforced that perception. *See id.* (A principal can create apparent authority by appointing an agent to a position that carries generally recognized duties or by placing an agent in charge of a geographically distinct area.) Further, National's 1998 newsletter and the much-analyzed 2002 brochure along with MacLaren's flier raise a number of factual disputes about MacLaren's apparent authority: whether National led oral surgeons to believe that National's agents could obtain a range of insurance products for National's customers; whether those products were to be provided at favorable rates; whether National made clear that it only had an alliance with Kemper and no other insurers; and whether National promoted MacLaren's non-professional liability insurance products to oral surgeons. Also, MacLaren's appearances alongside National staff at oral surgery conferences reinforced her image as a representative of National Insurance. Finally, National's alleged failure to publicly explain that MacLaren was only its representative for professional liability insurance sales further suggests that MacLaren acquired apparent authority. In sum, since the parties present clashing declarations concerning key aspects of National's promotional activities, factual disputes remain regarding whether National's conduct created apparent authority for MacLaren to act on behalf of National in selling various insurance lines.

Second, there is also a factual dispute over whether National's conduct reasonably led plaintiffs to believe that MacLaren was authorized by National to sell non-professional liability

Page 21 - FINDINGS AND RECOMMENDATION

insurance on their behalf.  For example, National contends that because it only advertised that its agents could provide Kemper insurance products, plaintiffs acted unreasonably in believing that MacLaren acted on behalf of National when it sold them policies apparently written by Mutual of Enumclaw.  However, although National's advertisement mentions an alliance with Kemper, it could be reasonable for an oral surgeon to mistakenly assume that National's agents also collaborated with other insurance carriers besides Kemper, especially when those policies were provided by a National agent such as MacLaren and were documented with insurance certificates identical to National's own policies.  National also stresses that it did not require oral surgeons to carry general liability, business liability, and umbrella coverage in order to purchase National's professional liability coverage, thereby suggesting that it was unreasonable for plaintiffs to perceive that National endorsed MacLaren's sale of those lines of insurance.  By contrast, plaintiffs present evidence that carrying such additional coverage was a mandatory recommendation emphasized at National's Risk Management Seminars, indicating that they were reasonable in believing that National authorized MacLaren to provide that additional coverage. Even assuming without deciding that National did not require such additional coverage, a factfinder could still determine that plaintiffs were reasonable in believing that National authorized its agents to promote a wider range of insurance options to lure potential customers away from full-service insurance providers.  Thus, factual disputes remain on the second step of the apparent authority analysis.

Finally, factual disputes also remain concerning whether plaintiffs reasonably relied on MacLaren's apparent authority to sell other insurance on National's behalf.  For instance, plaintiffs assert that they decided to switch their professional liability coverage to National

because of National's publicity indicating that MacLaren, as an agent for National, could also

obtain other necessary insurance coverage for their practices.  National, however, seems to

dispute that their advertising could have led to such reliance, since they only promoted an

association with Kemper, while MacLaren sold plaintiffs Mutual of Enumclaw policies.  Also,

plaintiffs contend that they relied on National Insurance's assurances that MacLaren was a

trustworthy insurance agent in deciding to purchase other insurance products through her.  By

contrast, National Insurance denies that it would ever discuss the competency of a particular

agent beyond confirming the agent's licensure by the state insurance department.  (Passolt Decl.,

¶24).  Whether plaintiffs' reliance was reasonable is therefore a jury question.

Overall, plaintiffs have provided enough evidence to raise factual issues at each analytical

step concerning whether National Insurance's conduct created apparent authority in MacLaren to

sell other insurance products on behalf of National.

### E.    Negligence, Breach of Contract, and Fraud Claims

Since plaintiffs rely on a vicarious liability theory to support many of their claims, the

success of defendant's motion for summary judgment depends on its ability to show that, as a

matter of law, MacLaren's conduct was outside the scope of her agency relationship with

National.  Because National fails to meet that burden, plaintiffs' negligence, breach of contract,

and fraud claims survive summary judgment.  Assuming without deciding that MacLaren was

National's agent in selling other insurance products, plaintiffs produce evidence that National

failed to supervise or monitor MacLaren's conduct.  (Wagner Decl., Ex. 4 at 2-3.)  Moreover,

MacLaren's undisputed failure to actually obtain insurance after promising plaintiffs to do so is

actionable under negligence, breach of contract, or both, as long as such conduct is imputed to

National. *See Precision Castparts Corp. v. Johnson & Higgins of Or., Inc.*, 607 P.2d 763, 765

(Or. Ct. App. 1980). Finally, again assuming vicarious liability, MacLaren's undisputed issuance

of false certificates of insurance would easily satisfy the elements of a fraud claim. *See Webb v.

Clark*, 546 P.2d 1078, 1080 (Or. 1976) (en banc) (elements of fraud). Consequently, National

Insurance's motion for summary judgment should be denied on plaintiffs' negligence, breach of

contract, and fraud claims.

### F.     Washington Consumer Protection Act Claim

Although plaintiffs' claim under Washington's Consumer Protection Act (CPA) also

relies on a vicarious liability theory, it requires some additional analysis. To establish a CPA

violation, plaintiffs must prove: (1) an unfair or deceptive act or practice; (2) occurring in the

conduct of trade or commerce; (3) that affects the public interest; (4) that injures plaintiff's

business or property; and (5) that the plaintiff's injury was caused by the unfair or deceptive act.

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535-39 (Wash.

1986) (en banc). Plaintiffs allege that MacLaren's systematic sale of false insurance to oral

surgeons, including 25 in Washington, as imputed to National Insurance, satisfies all the

elements of a CPA violation. National Insurance, however, argues that plaintiffs lack standing to

bring a CPA claim because they are Oregon residents and that, even if plaintiffs have standing,

plaintiffs fail to satisfy the public interest element.

The CPA's standing requirement derives from the statute itself, which requires that a

plaintiff must allege injury in trade or commerce that "directly or indirectly affect[s] the people of

the state of Washington." Wash. Rev. Code § 19.86.010(2); *see Schnall v. AT&T Wireless

Servs., Inc.*, 225 P.3d 929, 939 (Wash. 2010) (en banc). Moreover, the test for a CPA violation

propounded by *Hangman Ridge* incorporates the standing requirement in the public interest and

injury elements. *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 889–90 (Wash. 2009) (en

banc). National Insurance improperly relies on *Schnall AT&T* for the proposition that plaintiffs

necessarily lack standing to sue under the CPA because they are Oregon residents. *See Tool*

*Works, Inc. v. Seattle Safety, LLC,* No. C07-2061JLR, 2010 U.S. Dist. LEXIS 118411, at *35–36

(W.D. Wash. Nov. 8, 2010) ("While the court agrees that reading *Schnall* to eliminate standing

under the CPA for every nonresident would be an overly broad interpretation, Plaintiffs

interpretation limiting *Schnall* solely to the class action context is too narrow.") In *Schnall*,

AT&T customers filed a nationwide class action under the CPA regarding misleading billing

charges. There, the Washington Supreme Court relied on the CPA's standing requirement in

declining to certify a class including non-residents of Washington for claims based on acts

occurring outside of Washington. *Schnall*, 204 P.3d at 938. The Court held that "[i]n the

context of this case, the CPA only applies to claims brought by persons residing in Washington."

*Id.* Federal courts interpreting *Schnall* indicate that the critical inquiry in addressing standing is

the connection between plaintiffs' CPA claim and the interests of Washington citizens and

residents, not whether a defendant's business is located in Washington or whether a significant

portion of the disputed transaction occurred within Washington. *See Tool Works,* 2010 U.S.

Dist. LEXIS 118411, at *36–37 (noting that plaintiff's emphasis on the defendant's principal

place of business was misplaced and analyzing instead whether there was a sufficient connection

between the plaintiffs' CPA claim and the people of the state of Washington for plaintiffs to be

said to be acting "'on behalf of persons residing within the state'"); *K.S. v. Ambassador*

*Programs, Inc.*, No. CV-08-243-RMP, 2010 U.S. Dist. LEXIS 39343, 2010 WL 1629247 at *2

Page 25 - FINDINGS AND RECOMMENDATION

(E.D. Wash. Apr. 21, 2010) (dismissing Virginian's claim against Washington company that solicited plaintiffs and others to participate in a trip to Australia because plaintiffs were "outside of th[e] sphere of interest" as defined in *Schnall*).

Here, plaintiffs lack standing to bring their CPA claims. First, none of plaintiffs are Washington residents; therefore, they must present other evidence indicating that they possess standing. Additionally, the fact that MacLaren was a Washington resident who sold plaintiffs insurance policies from her Washington office is insufficient alone to confer standing. Further, the plaintiffs seek redress in this action only for their own purchase of fraudulent insurance policies, which caused them to lose insurance premiums and incur additional expenses in defending and settling claims while uninsured. Plaintiffs do not, however, seek any broad-ranging relief for all those victimized by MacLaren in Washington. Nor do plaintiffs suggest that their particular financial injuries in this case have affected Washington residents. Consequently, plaintiffs have not presented sufficient evidence to suggest that they act on behalf of the people of Washington in bringing suit under the CPA. The mere existence of 25 oral surgeons in Washington who suffered similar injuries as plaintiffs in a similar manner does not confer standing for plaintiffs to under the Washington CPA. Since plaintiffs lack standing, the defendant's motion for summary judgment should be granted as to plaintiffs' Washington CPA claim.

### G.    Oregon Unfair Trade Practices Act Claim

Unlike the claims discussed above, plaintiffs' Oregon's Unfair Trade Practices Act (UTPA) claim does not only rely on a vicarious liability theory. Although one of plaintiffs' allegations refer collectively to "defendants," (Second Amend. Compl., #16, ¶26(b)), the vast

Page 26 - FINDINGS AND RECOMMENDATION

majority of plaintiffs' allegations identify National Insurance as the party engaging in unlawful trade practices by causing confusion regarding MacLaren's association with National Insurance. Therefore, it is necessary to determine whether plaintiffs have produced sufficient evidence to create a genuine issue of material fact on each element of their UTPA claim based on National Insurance's conduct alone, irrespective of MacLaren's actions.

The relevant part of the UTPA describes one particular unlawful trade practice as follows: "A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following: . . . Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another." Or. Rev. Stat. § 646.608(1)(c).  The right to recovery for a defendants use of an unlawful trade practice is established by Or. Rev. Stat. § 646.638(1), which provides: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of wilful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action in an appropriate court to recover actual damages or $200, whichever is greater."  Or. Rev. Stat. § 646.638(1).

Here, I find that plaintiffs present enough admissible evidence to create an issue for the jury on their UTPA claim.  As I have discussed above, plaintiffs' declarations describing statements of unidentified National Insurance officials may be considered for their truth in regards to plaintiffs' direct liability claims.   Thus, plaintiffs and National present conflicting evidence regarding whether National's representatives and advertising materials touted that its agents could obtain favorable rates on business, office, and umbrella insurance products. Similarly, the parties dispute whether National required its insureds to have other insurance

before purchaing professional liability coverage and whether National encouraged plaintiffs to

use MacLaren for obtaining those insurance services.  Likewise, while plaintiffs assert that

National "allowed" MacLaren to accept their premium checks for other insurance products, *see,*

*e.g.* Pederson Decl., ¶11, National's agency agreement with MacLaren prohibited that practice.

Moreover, plaintiffs have properly alleged ascertainable damages from National's violations.

(Second Amended Complaint, #16, ¶¶15, 28.)  Finally, it is reasonable to infer from the nature of

National's alleged promotional activities, its failure to clearly explain the limitations of

MacLaren's relationship, and the business advantages National stood to gain from MacLaren's

activities, that National acted willfully.  *See*  Or. Rev. Stat. § 646.638(1) (requiring willful

conduct to recover for use of an unlawful trade practice).  Therefore, National's motion for

summary judgment should be denied as to plaintiffs' UTPA claim.

### H.    Negligent Supervision Claim

Plaintiffs' other direct liability claim is their Oregon common law negligent supervision

claim.  In approaching negligence actions, Oregon courts first analyze "whether a special

relationship between the plaintiffs and the defendant is alleged to exist due to 'a status, a

relationship, or a particular conduct that creates, defines or limits the defendant's duty.'"  *Buchler*

*v. Oregon*, 853 P.2d 798, 800–801 (Or. 1993) (quoting *Fazzolari v. Portland School Dist. No. 1J*,

734 P.2d 1326, 1336 (Or. 1987)).  Where plaintiffs allege no such special relationship, courts

apply the general foreseeability principles described by the Oregon Supreme Court in *Fazzolari*.

*Buchler*, 853 P.2d at 800-801.  That is, where there is no special relationship,  the defendant's

liability for the plaintiff's injuries depends not on whether defendant owed a duty to the plaintiff,

but on whether the defendant's conduct "unreasonably created a foreseeable risk to a protected

interest of the kind of harm that befell the plaintiff." *Fazzolari*, 734 P.2d at 1336.

Where a special relationship is alleged, however, "duty plays an affirmative role."
*Fazzolari*, 734 P.2d at 1331.  In special relationship cases, the scope of the defendant's duty can
be defined either by the special relationship itself – where the relationship specifically describes
"the types of harms or class of persons that it encompasses"– or by common law principles of
reasonable care and foreseeability of harm.  *Allstate Ins. Co. v. Tenant Screening Servs.*, 914
P.2d 16, 21 (Or. Ct. App. 1996); *see also Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83
P.3d 322, 329 (Or. 2004).  Indeed, the scope of a defendant's duty where a special relationship is
alleged should be determined on a case-by-case basis.  *Onita Pac. Corp. v. Trs. of Bronson*, 843
P.2d 890, 896 (Or. 1992).

Here, plaintiffs have presented sufficient evidence to suggest that a special relationship
exists between them and National Insurance.  For example, plaintiffs' declarations assert
National required plaintiffs to purchase stock in the company before becoming insured, National
agreed to provide special services and attention to oral surgeons who were members of AAOMS,
National's mission was narrowly limited to serving and protecting the oral and maxillofacial
surgery community, National went to great lengths to protect the financial interests of its
insureds/shareholders, and National encouraged its customers to consult with its agents regarding
all insurance matters.  (Malmquist Decl., #52, ¶¶5-8.)  Since National's special relationship with
plaintiffs focused on selling insurance to protect oral surgeons, it is at least arguable that the
relationship defined the scope of National's duty to include protecting its customers from
insurance fraud, exactly the type of harm plaintiffs ultimately suffered.  Even if the special
relationship does not define the scope of National's duty, common law principles can be used to

infer the scope of National's duty.  Plaintiffs present evidence suggesting that National

encouraged its customers to rely on its agents for general insurance advice and services.  Thus,

National arguably incurred a duty to exercise reasonable care in selecting and supervising their

agents.  Moreover, once National discovered in 2007 that MacLaren improperly handled its

customers' premium checks, it likely also incurred a duty to investigate MacLaren's external

dealings with National customers or at least encourage them to investigate for themselves, since

it was foreseeable that MacLaren had also engaged in other acts of financial impropriety.

Once the scope of National's duty is defined, it becomes clear that plaintiffs present

enough evidence to survive summary judgment on their negligent supervision claim.[11]

National's failure to screen, supervise, or investigate MacLaren and its failure to notify plaintiffs'

after uncovering MacLaren's misconduct arguably breached its duties to plaintiffs.  Moreover,

National's conduct arguably caused plaintiffs' loss; plaintiffs assert in declarations that they

relied on National's promises that MacLaren was competent and trustworthy when they decided

to purchase their non-professional liability insurance coverage through MacLaren.  Thus,

plaintiffs have presented sufficient facts to advance to a jury on their direct liability negligent

supervision claim against National Insurance.

III.    **Plaintiffs' Motion for Summary Judgment**

Plaintiffs argue that they are entitled to summary judgment on all claims because no

---

[11] In cases where a special relationship exists, Oregon courts do not apply the general
rules of common law negligence from *Fazzolari* and the accompanying negligence elements
described in *Solber  v. Johnson*, 760 P.2d 867, 870 (Or. 1988).  *See Abbott v. W. Extension
Irrigation Dist.*, 822 P.2d 747, 748 (Or. Ct. App. 1991) (special relationship between landowner
and trespasser takes negligence claim out of the general rules for negligence).  Consequently, I
measure plaintiffs' negligence claim against traditional elements of negligence instead of the
post-*Fazzolari* elements, which replace duty with foreseeability principles.

genuine issues of material fact exist for trial. However, even when making all reasonable

inferences for plaintiffs, I previously determined that the crucial issue of MacLaren's apparent

authority was rife with factual disputes. Thus, when I make reasonable inferences in favor of

defendants, as I must on plaintiffs' motion, I cannot establish as a matter of law that MacLaren

possessed apparent authority to sell other insurance products to plaintiffs on behalf of National

Insurance. Therefore, plaintiffs' motion for summary judgment necessarily fails on all claims

relying on vicarious liability. Concerning plaintiffs' UTPA and negligent supervision claims

which directly assert National's liability, questions of material fact also exist. Consequently,

plaintiffs' motion for summary judgement should be denied.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (#27) should be

granted as to plaintiffs' Washington Consumer Protection Act claim and denied as to plaintiffs'

other claims. Plaintiffs' cross-motion for partial summary judgment (#48) should be denied.

Plaintiffs' motion to strike (#49) is denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any,

are due fourteen (14) days from service of the Findings and Recommendation. If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

//

//

//

//

Page 31 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.


Dated this 28th day of December, 2010.


 /s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge