IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAY P. MALMQUIST, D.M.D; JAY P.
MALMQUIST, D.M.D., P.C.; RODNEY S.
NICHOLS, D.M.D., P.C.; HENRY C. WINDELL,
D.M.D.; HENRY C. WINDELL, D.M.D.,
P.C., NORTHWEST ORAL AND
MAXILLOFACIAL SURGEONS, LLC;
and GARY T. PEDERSON, D.D.S., P.C.

    Plaintiffs,

                   CV. 09-1309-PK

                   FINDINGS AND
v.                  RECOMMENDATION

OMS NATIONAL INSURANCE
COMPANY, an Illinois Risk Retention
Group; BRENDA L. MACLAREN-
BEATTIE dba THE MACLARENT GROUP,

    Defendants.

PAPAK, Judge:

  Plaintiffs purchased several different insurance products from an insurance agent, Brenda

Page 1 - FINDINGS AND RECOMMENDATION

MacLaren-Beattie ("MacLaren"), who was associated with OMS National Insurance Company ("National Insurance" or "National"). Plaintiffs' claims arise out of MacLaren's alleged failure to procure insurance for them as promised. This court previously resolved cross motions for summary judgment, allowing plaintiffs' claims for negligence, breach of contract, fraud, and violation of the Oregon Unfair Trade Practices Act to advance to a jury, while granting summary judgment against plaintiffs' Washington Consumer Protection Act claim. Also, the court permitted National Insurance to amend its answer to state several new affirmative defenses, including its seventh affirmative defense alleging that a release contractually bars Malmquist and his professional corporation (collectively "Malmquist") from recovering damages associated with a lawsuit filed against Malmquist by his former patient. Now before the court is National Insurance's motion for summary judgment on that affirmative defense. (#103.) For the reasons described below, the motion should be denied.

## BACKGROUND

### I.    Patient Lawsuit

On July 2008, Katherine Edson, a former patient of Dr. Malmquist, filed a lawsuit in state court alleging that she had been groped by Dr. David Burleson, an independent physician who administered anaesthesia in Dr. Malmquist's office. (Jaeger Decl., #105, Ex. 1.) The suit alleged claims for sexual battery, fraud, negligence and abuse of an incapacitated person, and named as defendants Malmquist, Dr. Burleson and his employer Oregon Anaesthesiology Group, and Elaine Johnson, an attorney Malmquist retained to assist him in responding to Burleson's misconduct. *Id.* Malmquist, through his personal attorney Mark Bocci, demanded that National defend and indemnify him against any potential damages resulting from Edson's suit under the

professional liability insurance policy Malmquist had purchased from National through

MacLaren. (Bocci Decl., #112, ¶4.)  Malmquist also threatening to sue National if it declined to

defend and indemnify.  *Id.*  Ultimately, National agreed to defend Malmquist under a reservation

of rights, which affirmed that the National policy provided Malmquist no coverage and that

National would not indemnify Malmquist if he lost.  *Id.* at ¶5.  National hired several attorneys to

defend Malmquist against the patient lawsuit.  (Jaeger Decl., #105, ¶4.)

## II.    Release

        After lengthy settlement negotiations, including a full day mediation, National and

Malmquist agreed in principal to settle Edson's suit, with National paying a portion of the

settlement and Malmquist paying the balance.  (Bocci Decl., #112, ¶6.)  After the mediation

concluded, National also insisted Malmquist sign a release prepared by National.  *Id* at ¶7.  The

release stated:

> This Release is entered into between OMS National Insurance Company ("OMNSNIC"),
> and Jay P. Malmquist, DMD, personally and as President of Jay P. Malmquist, DMD, PC.
>
> Plaintiff Katherine Edson filed a lawsuit in the Circuit Court of the State of Oregon for
> the County of Multnomah against Jay P. Malmquist, DMD and Jay P. Malmquist, DMD,
> PC, among other defendants, Case No. 0803-04778.  The lawsuit alleges certain acts or
> omissions by Jay P. Malmquist, DMD and by agents or employees of Jay P. Malmquist,
> DMD, PC from December 4, 2003 to June 19, 2007, resulting in damages to plaintiff
> Katherine Edson.
>
> OMSNIC desires to have all claims brought by plaintiff against Jay P. Malmquist, DMD
> and Jay P. Malmquist, DMD, PC arising out of the acts or omissions alleged in plaintiff's
> lawsuit settled.  In consideration for the payment of money by OMSNIC to plaintiff to
> resolve those claims, Jay P. Malmquist, DMD, personally and as President of Jay P.
> Malmquist, DMD, PC agrees that by such payment he and Jay P. Malmquist, DMD, PC
> will make no claim or demand and will bring no action, suit, or other proceeding of any
> nature against OMSNIC, or based on OMSNIC's conduct, which Jay P. Malmquist, DMD
> or Jay P. Malmquist, DMD, PC now have, or may hereafter accrue or otherwise be
> acquired, on account of, or in any way growing out of, or which relates to the acts or

omissions alleged in plaintiff's lawsuit, including, without limitation, any and all known or unknown claims for breach of contract, indemnity, contribution, bad faith, or any other claim related to the conduct alleged in plaintiff's lawsuit.

[Malmquist and his corporation] further agrees that . . . he and Jay P. Malmquist, DMD, PC will not make or assign any claim or demand and will not bring any action, suit, or other proceeding against OMSNIC based on expenses incurred, including fees paid or owed to Elaine H. Johnson, by Jay P. Malmquist, DMD or Jay P. Malmquist, DMD, PC before the filing of the lawsuit relating to the investigation of potential claims by plaintiff and defense against patient identity discovery efforts of the District Attorney and other state authorities.

The parties to this Release acknowledge and agree that no privity of interest exists between them with respect to any third party claims against others arising from the lawsuit, and OMSNIC retains all rights to seek reimbursement from any person or entity other than Jay P. Malmquist, DMD or Jay P. Malmquist, DMD, PC for the amounts OMSNIC pays as defense or indemnity costs in connection with the lawsuit.

(Jaeger Decl., #105, Ex. 2.)

## III.    Communication Between Counsel

After reading the draft release, Malmquist's attorney Mark Bocci became concerned that the release was ambiguous and contained terms that had never previously discussed. (Bocci Decl., #112, ¶8.) Because Bocci believed time was running short and further revisions of the release would strain already tense relationships between the various attorneys, Bocci attempted to clarify some of the release's perceived ambiguities and new terms through an email with National's counsel Thomas Gordon. *Id.* at ¶¶6,8. Bocci's email to Gordon on March 18, 2009 first observed that the draft release added language suggesting that National wanted to reserve rights to sue other parties. *Id.* at Ex. 1. Bocci then wrote: "we have no problem with the new language except as it applies to Elaine Johnson, [Malmquist's corporate attorney] . . . we would like her excluded from any further claims . . . none of this was discussed at mediation either way so is a new issue raised by recent additions . . . an email from you with that assurance would

Page 4 - FINDINGS AND RECOMMENDATION

suffice and we can then use the current form of release . . . ." *Id.* After encouraging the parties to

adhere to their negotiated agreement, Bocci closed the email stating: "please obtain the necessary

permission to assure [Malmquist] that [Johnson] will not be sued . . . ." *Id.* at Ex. 1.

> The next day, Gordon responded by email to Bocci as follows:

> Mark: OMSNIC is willing to waive any claims against Elaine Johnson to the extent that she will do the same and that Dr. Malmquist also agrees that he releases any claims against OMSNIC related to Ms. Johnson. In short, all three parties agree that there are no remaining claims of any kind, between them, either tort or contract, with respect to the policies issued by OMSNIC to Malmquist individually or Malmquist PC. OMSNIC would still retain any claims it has against the Anaesthesiology group and/or Dr. Burleson.

*Id.* Bocci apparently found Gordon's email consistent with his own understanding of the parties'

intent, which he later expressed in a declaration as: "Dr. Malmquist waived all claims against

OMSNIC with respect to OMSNIC's failure to provide him a complete defense and indemnity

under his professional liability policy (which is the only type of insurance policy issued by

OMSNIC) in connection with Edson's claim/lawsuit." *Id.* at ¶10. Consequently, on March 25,

2009, Bocci approved the form of the release and Malmquist signed the release. (Jaeger Decl.,

#105, Ex. 2 at 3.) National signed the release a month later. *Id.* at 4.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues

exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996). When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. *Liberty Lobby,* 477 U.S. at 249; *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322-23; *see also Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989). The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor,* 880 F.2d at 1045; *Leer v. Murphy,* 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Liberty Lobby,* 477 U.S. at 249-50; *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Taylor,* 880 F.2d at 1045.

## DISCUSSION

### I.    Releases

Judge King aptly summarizes the appropriate legal standard for interpretation of releases

under Oregon law:

> Courts in the Ninth Circuit rely on local contract law to interpret release and settlement agreements. *See Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). A release is a contract in which one or more parties agree to abandon claims or rights. *Lindgren v. Berg*, 307 Or. 659, 665, 772 P.2d 1336 (1989). If the terms of the release unambiguously express the intent of the parties, the release must be enforced accordingly. *Patterson v. Am. Med. Systems*, 141 Or.App. 50, 53, 916 P.2d 881 (1996). The rule is that an honest release, untainted by unconscionable conduct, cannot be set aside because it was improvident. *Walcutt v. Inform Graphics, Inc.*, 109 Or.App. 148, 151, 817 P.2d 1353 (1991). Releases and settlements are favored by the law, and are not rendered unenforceable either by ordinary mistakes or negligent mistakes in the parties' knowledge and understandings when they enter into them. *Id.* Rather, a release agreement is subject to construction and interpretation like any other contract. *Ristau v. Wescold, Inc.*, 318 Or. 383, 387, 868 P.2d 1331 (1994).

*Vance v. Wash. Cnty. Waste Water Treatment Facilities*, No. CV 09-711-KI, 2010 WL 545876, at *3–4 (D. Or. Feb. 9, 2010).

## II.    Contract Interpretation

Under Oregon law, courts follow three analytical steps to interpret a contractual provision. *Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997). First, the court determines as a matter of law whether an ambiguity exists in the contract by examining the text of the particular disputed provision in the context of the whole contract. *Id.* Second, if an ambiguity exists, the trier of fact resolves the ambiguity by discerning the intent of the parties from extrinsic evidence, including the parties' "practical construction" of the contract. *Id.* at 363-364. Third, if the ambiguity cannot be resolved by examining extrinsic evidence, the court resorts to maxims of construction.[1]  *Id.* at 364. Thus, a party is entitled to summary judgment on

---

[1] Several Oregon courts, however, acknowledge that judges may also properly utilize textual maxims during the first step of the *Yogman* analysis. *Portland Fire Fighters' Ass'n, Local 43 v. City of Portland*, 181 Or. App. 85, 94 n.6, 45 P.3d 162 (2002) (citing *Kell v. Oppenlander*, 154 Or.App. 422, 426, 961 P.2d 861 (1998)).

Page 7 - FINDINGS AND RECOMMENDATION

a contract dispute only if the governing terms of the contract are unambiguous. *Milne v. Milne Construction*, 207 Or. App. 382, 388, 142 P.3d 475 (2006).

Concerning the first step in the *Yogman* analysis, a contract provision is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is capable of more than one plausible and reasonable interpretation. *Batzer Construction, Inc. v. Boyer*, 204 Or. App. 309, 313, 129 P.3d 773 (2006). "The threshold to show ambiguity is not high." *Milne*, 207 Or. App. at 388, 142 P.3d 475. Generally, disposition of a contract dispute as a matter of law is not appropriate unless the meaning of the disputed provisions "is so clear as to preclude doubt by a reasonable person." *Deerfield Commodities v. Nerco, Inc.*, 72 Or. App. 305, 317, 696 P.2d 1096 (1985).

## III.    Extrinsic Evidence in Assessing Ambiguity

Despite the relatively straightforward analytical framework established by *Yogman*, Oregon law remains somewhat unclear regarding whether courts may consider extrinsic evidence to determine if a contract is ambiguous. *Fogg v. Wart*, No. CV-06-160-ST, 2006 WL 3716745, at *5 (D. Or. Dec. 14, 2006). In *Abercrombie v. Hayden Corp.*, 320 Or. 279, 292, 883 P.2d 845 (1994), the Oregon Supreme Court held that a trial court may consider parol and other extrinsic evidence to determine whether the terms of an agreement are ambiguous. Several years later, however, the Oregon Supreme Court decided *Yogman*, which appeared to conflict with *Abercrombie* by strongly implying that no extrinsic evidence would be examined in the first step of contract analysis, which determines whether the contract contains ambiguous terms. *Fogg*, 2006 WL 3716745, at *5.

Since then, the Ninth Circuit and the Oregon Court of Appeals have disagreed over the

Page 8 - FINDINGS AND RECOMMENDATION

propriety of using extrinsic evidence to determine the existence of ambiguity in a contract. *Id.* In

*Webb v. Nat'l Union Fire Ins. Co. Of Pittsburgh*, 207 F.3d 579 (9th Cir. 2000), the Ninth Circuit

held that *Yogman* implicitly overruled *Abercrombie* since "the consensus among Oregon courts is

that they are opposed to considering extrinsic evidence to determine the parties' intent unless an

ambiguity is apparent from the four corners of the document." *Id.* at 581-582 (citing *Yogman,*

325 Or. at 361, 363-364).  By contrast, the Oregon Court of Appeals continued to follow

*Abercrombie*.  *See City of Eugene*, 171 Or.App. 681, 687 n.7, 17 P.3d 544 (2000); *OTECC v.*

*Co-Gen,* 168 Or.App. 466, 476 n.8, 7 P.3d 594 (2000)*.*  Indeed, in *Batzer Construction*, the

Oregon Court of Appeals specifically voiced its disagreement with the Ninth Circuit's decision in

*Webb*, holding that *Abercrombie* survives *Yogman* and interpreting *Abercrombie* to permit courts

to consider extrinsic evidence of the circumstances of contract formation in determining whether

a contract term is ambiguous.  *Batzer,* 204 Or. App. at 314-315.

    In *Fogg v. Wart*, Judge Stewart sought to determine whether a federal district court in

Oregon should follow the Oregon Court of Appeal's decision in *Batzer* or the Ninth Circuit's

decision in *Webb*.  Initially, Judge Stewart observed that district courts were bound by the Ninth

Circuit's interpretation of Oregon law in *Webb* until the Oregon Supreme Court resolves the

issue.  *Fogg*, 2006 WL 3716745, at *6.  Nevertheless, Judge Stewart concluded that *Batzer* and

*Webb* could be reconciled, since *Webb* acknowledged that Oregon courts may consider the

circumstances of contract formation in step one of the *Yogman* analysis, but disregarded the

particular extrinsic evidence offered because it did not relate to the circumstances under which

the contract was made.  *Id.* at *6.  Thus, Judge Stewart concluded that both *Webb* and *Batzer* lead

to the same conclusion: at step one of the *Yogman* analysis, the court "may examine extrinsic

evidence limited to the circumstances under which the contract was made." *Id.* at *6-7. Another

recent opinion in this district also adhered to Judge Stewart's conclusion. *See Nieman v.*

*Interstate Distrib. Co.*, No. CV 09-3102-PA, 2010 WL 2539719, at *4 (D. Or. June 22, 2010).

Likewise, I consider extrinsic evidence concerning the circumstances of contract formation in

determining whether the contract contains an ambiguous term.

 Oregon courts offer some guidance about the particular types of extrinsic evidence that

illustrate the circumstances under which a contract is made. For example, when interpreting

language of a release, courts properly consider the nature of underlying litigation that was the

object of the parties' settlement. *Nixon v. Cascade Health Servs., Inc.*, 205 Or. App. 232, 241

n.10, 134 P.3d 1027 (2006). The "content of discussions during contract negotiations" may also

be considered. *Id* ; *Fogg*, 2006 WL 3716745, at *8. Prior drafts of an agreement and one

party's acquiescence to another party's statements also constitute extrinsic evidence of the

circumstances under which parties form an agreement. *Batzer*, 204 Or.App. at 320-21; *Fogg*,

2006 WL 3716745, at *8. By contrast, "later statements about what the contract means" are not

extrinsic evidence of the circumstances of contract formation. *Webb*, 207 F.3d at 582 n.1; *Fogg*,

2006 WL 3716745, at *8.

## IV. Release Between Malmquist and National Insurance

 The parties dispute the meaning of the phrase in paragraph three of the release waiving

claims "on account of, or in any way growing out of, or which relate[] to the acts or omissions

alleged in plaintiff's lawsuit . . . ." (Jaeger Decl., #105, Ex. 2, at 1.) The second part of that

phrase– "the acts or omissions alleged in the plaintiff's lawsuit"– are detailed in Edson's

complaint, known by both parties, and are thus unambiguous.[2] (Jaeger Decl., #105, Ex. 1). The

parties therefore focus their dispute on the first part of the phrase. When read in isolation, I agree

with National that the language appears to preclude any claim having any connection whatsoever

with Malmquist's or Johnson's handling of Burleson's misconduct. Since I determine that

Oregon law allows courts to examine extrinsic evidence of the circumstances of contract

formation when determining if a contract is ambiguous, I consider the emails between

Malmquist's and National's counsel prior to execution of the release and evidence of the nature

of the underlying litigation that was the object of the parties' settlement. Both these inquiries

suggest an alternative interpretation of the scope of the release: Malmquist relinquished only

claims related to the Edson suit with respect to National's failure to perform its obligations under

Malmquist's professional liability coverage. Additionally, a related section of the release also

reinforces this conclusion. Finally, although many cases discuss the broad reach of release

language similar to the language utilized here, none involve extrinsic evidence apparently

limiting the scope of the release. Therefore, I conclude that the release is ambiguous and

National's motion for summary judgment on its seventh affirmative defense should be denied.

///

---

[2] The complaint alleges as follows: Malmquist permitted Burleson to anaesthetize Edson
despite knowing that Burleson had previously groped another sedated patient; after Malmquist's
staff told Malmquist that Burleson had groped Edson, Malmquist and Johnson failed to tell
Edson that Burleson had abused her and Malmquist allowed Burleson to continue sedating other
patients; Malmquist and Johnson failed to report Burleson's acts to law enforcement or the
medical board; Johnson reported to the Oregon Anaesthesiology Group that one of their
anaesthesiologists had inappropriately touched two female patients, but refused to identify
Burleson and the patients that he groped; and Johnson and Malmquist refused to identify Edson
and another former patient to the medical board during its investigation and in records produced
to the grand jury.

Page 11 - FINDINGS AND RECOMMENDATION

### A.    Email Between Counsel

The emails between Malmquist's counsel and National's counsel provide perhaps the most persuasive evidence of the release's ambiguity. Mark Bocci's initial email to Thomas Gordon focused on whether the release language permitted National to bring a claim against Elaine Johnson and requested that National "exclude" her from further claims. (Bocci Decl., #112, Ex. 1.) Gordon's response addressed this concern by stating that National was willing to waive claims against Johnson, so long as she did the same. *Id.* Gordon, unprompted, also discussed the scope of the release, writing that it bars "remaining claims of any kind . . . with respect to *the policies issued by OMSNIC to Malmquist . . .*" *Id.* (emphasis added). Thus, the summation of National's own counsel during contemporaneous negotiations suggests that the disputed release language only bars claims concerning National's potential breach of its obligations under the professional liability insurance policy it sold Malmquist, not all claims whatsoever related to Edson's suit.

National argues that Gordon's email does not create an ambiguity in the release because it merely reflects the parties' shared understanding of the universe of known claims Malmquist would be waiving by executing the release. National contends that the release language waiving "any and all known or unknown claims . . . related to the conduct alleged in the plaintiff's lawsuit" precludes not only the known claims that Gordon references in his email, but also claims unknown by the parties at the time of the release, like the one that Malmquist presently pursues. Gordon's email certainly does not undercut the broad release language so conclusively as to permit this court to find that the release unambiguously permits Malmquist's current suit and declare summary judgment for Malmquist. Nor does the email even tip the weight of the

evidence in favor of Malmquist's proposed interpretation. Nevertheless, Gordon's email

suggests a second plausible and reasonable interpretation of the release that precludes summary

judgment, especially given the low threshold for demonstrating that a contract is ambiguous.

*Batzer*, 204 Or. App. 3131; *Milne*, 207 Or. App. at 388.

### B.    Context of Underlying Litigation

Additionally, the context of the litigation leading to execution of the release supports two

different reasonable interpretations of the release language. On the one hand, the release could

be seen as a part of a bargained-for exchange whereby Malmquist agreed to personally contribute

towards the settlement of Edson's claims and forgo any future litigation against National related

to Edson's abuse to avoid the potential of an unfavorable, expensive verdict for which National

would not provide indemnity. Under this view, the release was integral to the settlement of

Edson's suit and thus it arguably precludes Malmquist's later recoupment of any costs associated

with that suit. On the other hand, the release could be seen as primarily related to Malmquist's

threatened litigation against National Insurance for breach of its duties under the professional

liability insurance policy. In that context, the release precludes only additional litigation of that

nature. Again, the extrinsic evidence points to two reasonable interpretations of the release

language and militates against summary judgment.

### C.    Waiver of Claim for Johnson's Legal Fees

The release's separate provision waiving claims to recoup Johnson's legal fees also

suggests that the release language is ambiguous. Edson's complaint alleges that Malmquist

utilized Johnson's legal services in responding to Burleson's misconduct and no party appears to

dispute that fact. The complaint even specifically alleges that Johnson acted negligently in

Page 13 - FINDINGS AND RECOMMENDATION

assisting Malmquist by failing to notify Edson of Burleson's abuse.  (Jaeger Decl., #105, Ex. 2, at ¶¶50-52.)  Therefore, it stands to reason that a suit to recover Johnson's legal fees for her response to Burleson's misconduct at least "relate[s] to" or even possibly "grow[s] out of" the acts or omissions alleged in Edson's lawsuit.  If so, the inclusion of the separate release provision addressing Johnson's fees seems superfluous.  Malmquist's proposed interpretation of the release language, however, would explain this apparent duplication.  Under Malmquist's view, the disputed language would only encompass claims against National for its failure to defend and indemnify Malmquist as required under Malmquist's professional liability coverage, thus requiring the parties to address claims against National for Johnson's legal fees in another section of the release.

D.    **National Insurance's Cases**

Finally, although National relies heavily on cases where courts found broad release language barred plaintiff's later claims, none of those cases dictates the analysis here.  For example, in *Lindgren v. Berg*, the Oregon Supreme Court considered whether a release precluded plaintiffs' claim that the release itself was induced by fraud.  *Lindgren v. Berg*, 307 Or. 659, 772 P.2d 1336 (1989).  The Court held that the fraud claim was barred because the release explicitly covered fraud claims, claims pertaining to the joint venture at issue in the case, and all claims related to the relationship between plaintiffs and defendant.  *Id.* at 665.

In *Ristau v. Wescold, Inc.*, the Oregon Supreme Court addressed whether a broadly worded release barring all claims "known or unknown, now existing" precluded a claim of fraud in the inducement of a contemporaneously executed stock sale agreement.  *Ristau v. Wescold, Inc.*, 318 Or. 383, 385, 868 P.2d 1331 (1994).  The Court concluded that the release was

sufficient to bar the fraud claim even though it did not explicitly reference such a claim, since the claim existed at the time the parties executed the release. *Id.* at 388. Moreover, the Court observed that "a general release from all claims and demands is sufficient to bar a specific claim, unless the claim is excepted from the release agreement." *Id.* at 389 (citing *Glickman v. Weston*, 140 Or. 117, 125, 11 P.2d 281, 12 P.2d 1005 (1932)).

In *McFarlin v. Gormley*, Judge Hubel addressed a situation similar to *Ristau*. *McFarlin v. Gormley*, No. CV-06-1594-HU, 2008 WL 410104 (D. Or. Feb. 12, 2008). There, plaintiff resigned his position as police chief for defendant, the City of McMinnville, executing a Separation /Release Agreement. *Id.* at *4-6. Plaintiff brought a claim for fraud in the inducement against the city, alleging that he would not have resigned but for the city's omissions and misrepresentations. *Id.* at *7. Plaintiff argued that the such a claim was not precluded by the Separation/Release Agreement because that agreement did not expressly release fraud claims. *Id.* at *6. The release, however, applied to "all claims known or unknown arising out of [plaintiff's employment and resignation]" and plaintiff's fraud in the inducement claim arose out of his employment and resignation with the city. *Id.* Thus, Judge Hubel concluded that, as in *Ristau*, the release agreement barred plaintiff's fraud in the inducement claim even though it did not specifically mention fraud. *Id.*

Finally, in *Vance*, the plaintiff complained of several racially disparaging incidents in the workplace. *Vance v. Wash. Cnty. Waste Water Treatment Facilities*, No. CV 09-711-KI, 2010 WL 545876, at *2 (D. Or. Feb. 9, 2010). After being placed on administrative leave for absence, tardiness, and a confrontation with her supervisor, plaintiff became aware that she would likely be terminated. *Id.* She preemptively negotiated a payment in exchange for resignation and

release of all claims against her employer. *Id.* The release waived "any and all claims . . . which [plaintiff] has or had against [defendant], arising out of any act or matter occurring on or before the date this Agreement is executed." *Id.* Judge King granted summary judgment for the employer on the plaintiff's employment discrimination suit, holding that the unambiguous terms of the settlement agreement barred plaintiff's claims, all of which she forfeited in exchange for a cash payment. *Id.* at *4.

These cases involved broadly worded releases somewhat like the language in paragraph three of the release between Malmquist and National. None of these cases, however, involved potential inconsistencies in the release language itself like the inconsistency created by the release provision addressing Johnson's attorney fees. Similarly, none examined extrinsic evidence concerning the execution of the release that arguably limited the scope of the release, like the email from National's counsel to Malmquist's counsel. Thus, while *Ristau*, *Lindgren*, *McFarlin*, and *Vance* all generally reinforce the notion that broadly worded releases even bar types of claims that are not expressly mentioned in the release, they are relatively unhelpful in resolving the pending motion.

In sum, extrinsic evidence of the circumstances underlying the execution of the release between Malmquist and National creates a genuine issue of material fact as to whether the parties intended the release to bar all claims whatsoever against National Insurance connected with the Edson lawsuit or just claims regarding National Insurance's failure to defend and indemnify Malmquist against that Edson suit under Malmquist's professional liability insurance policy. Accordingly, the trier of fact must determine the intent of the parties in executing the release at issue. *See Yogman*, 325 Or. at 361.

Page 16 - FINDINGS AND RECOMMENDATION

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (#103) should be denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 14th day of June, 2011.

Honorable Paul Papak
United States Magistrate Judge